# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ISPEEDBUY LLC, on behalf of itself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| CELLCO PARTNERSHIP d/b/a/ VERIZON WIRELESS, AT&T MOBILITY LLC, SPRINT NEXTEL CORPORATION, T-MOBILE USA, INC., U.S. CELLULAR CORPORATION, CTIA – THE WIRELESS ASSOCIATION, ERICSSON INC., MBLOX INCORPORATED, OPENMARKET INC., SYBASE, INC., SOUNDBITE COMMUNICATIONS, INC., SYNIVERSE TECHNOLOGIES, INC., VIBES MEDIA, 3C INTERACTIVE, LLC, and WMC GLOBAL, INC., | |
| Defendants. | |

12 CV 3731

RECEIVED
MAY 10 2012
U.S.D.C. S.D. N.Y.
CASHIERS

## CLASS ACTION COMPLAINT

Plaintiff iSpeedBuy LLC ("Plaintiff" or "iSpeedBuy"), by and through undersigned counsel, on behalf of itself and all others similarly situated, alleges as follows against Defendants AT&T Mobility LLC, Cellco Partnership d/b/a/ Verizon Wireless, Sprint Nextel Corporation, T-Mobile USA, Inc., U.S. Cellular Corporation, CTIA-The Wireless Association, Ericsson Inc., Mblox Incorporated, OpenMarket, Inc., Vibes Media, Sybase Inc., Soundbite Communications, Inc., Syniverse Technologies, Inc., 3C Interactive, LLC, and WMC Global, Inc. (collectively "Defendants"):

## NATURE OF ACTION

1.      Plaintiff brings this suit against Defendants for their violations of Sections 1 and 2 of the Sherman Act of 1890 (the "Sherman Act"), 15 U.S.C. §§ 1 and 2.

2.      Text messages are short electronic messages transmitted over a cellular network, generally to cell phones, but also from, to or between other wireless communications devices. Text messages are sometimes called SMS (for short message service).

3.      Text messages may be either person-to-person ("P2P") or application-to-person ("A2P"), that is, between businesses and consumers. Thus, an application-to-person text message is called "A2P SMS."

4.      A2P SMS may be sent to many customers when those customers have indicated a willingness to receive such messages. A2P SMS are opt-in, meaning that the recipient requests the content and consents to receiving the A2P SMS.

5.      A2P SMS are sometimes, but not always, sent at a high volume, such as when a non-profit entity sends an update to many interested contributors, an emergency message is sent from a school to students and parents, or many consumers send a message to a business for information on a service.

6.      Defendants AT&T Mobility LLC, Cellco Partnership d/b/a/ Verizon Wireless, Sprint Nextel Corporation, T-Mobile USA, Inc., U.S. Cellular Corporation, and Alltel Wireless (until it was acquired by Verizon Wireless on January 9, 2009) (referred to collectively as the "Carrier Defendants") conspired to set up a system in 2003 under which persons transmitting A2P SMS could not use inexpensive ten-digit telephone numbers, but were forced to use "common short codes" ("CSCs") – five-digit (and later six-digit) numbers – at materially higher lease and transmission charges with additional fees for connectivity and content review, all of which resulted in substantial overcharges to persons transmitting A2P SMS ("CSC Lessees") and materially higher revenues for the Carrier Defendants and other Defendants.

7.      The Carrier Defendants used their control of Defendant CTIA-The Wireless Association (the "CTIA"), the trade association to which the vast majority of the carriers in the United States belong, to cause the CTIA to issue guidelines and rules calling for the use of five-digit (and later six-digit) CSCs for transmission of A2P SMS, inhibiting the use of standard ten-digit numbers for transmission of A2P SMS, and imposing volume limits on text messages sent from ten-digit numbers.

8.      Through the CTIA, the Carrier Defendants established co-conspirator Neustar, Inc. ("Neustar") as the "CSC Administrator," the only entity that could issue CSCs.

9.      The Carrier Defendants agreed to prohibit users of CSCs from sending A2P SMS directly to the Carrier Defendants and instead required them to send such messages through a limited number of companies known as aggregators.  The Carrier Defendants entered into contracts with these aggregators controlling the per-message transmission prices to be charged to CSC Lessees, requiring the aggregators to enforce the system by blocking all A2P SMS sent from standard ten-digit telephone numbers, and requiring the aggregators to collect for the Carrier Defendants unnecessary program review fees from CSC Lessees.

10.      Defendants and co-conspirator Neustar collectively imposed connection, transmission, lease and review fees upon CSC Lessees that previously did not exist or were far higher than what CSC Lessees would have paid if they were allowed to use ten-digit numbers and standard transmission procedures.  The conspirators have thus been able to reap and divide supra-competitive profits from their conspiracy.

11.      On behalf of the Carrier Defendants and the CTIA, Defendant WMC Global, Inc. ("WMC") has audited the content of A2P SMS.  The CTIA, the Carrier Defendants and the aggregators named as Defendants also audit the content of A2P SMS.  If CSC Lessees are

3

deemed to be non-compliant with certain content guidelines, their CSCs may be blocked. This threat artificially increases the number of CSCs a CSC Lessee must obtain in order to avoid losing its ability to transmit content.

12. The establishment of the CSC system, which generates approximately $2.3 billion in revenues annually and continues to this day, has permitted the Defendants and co-conspirator Neustar to jointly control and anti-competitively exploit the transmission of A2P SMS and to eliminate the lower-priced ten-digit telephone number alternative for use in A2P SMS transmission.

13. Plaintiff, a CSC Lessee transmitter of large volumes of A2P SMS has been forced to pay excessive, inflated and unnecessary charges.

14. Plaintiff seeks to represent a class of CSC Lessees who, on or after April 5, 2008, leased CSCs from Neustar and sent A2P SMS through one or more aggregators.

15. Plaintiff on its own behalf and on behalf of the Class brings this class action seeking treble damages, injunctive relief and any other relief the Court deems proper.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act of 1914 (the "Clayton Act"), 15 U.S.C. §§ 15, 26, and Sections 1331 and 1337 of the United States Judicial Code, 28 U.S.C. §§ 1331 and 1337.

17. Venue is appropriate in this district pursuant to Sections 4(a), 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, and Sections 1391(b), (c) and (d) of the United States Judicial Code, 28 U.S.C. § 1391(b), (c) and (d), because one or more of the Defendants reside, are licensed to do business, are doing business, transact business, are found or have

agents in this district, and because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

18.     Personal jurisdiction over each of the Defendants is proper in this district pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, in that each of the Defendants resides, is found, transacts business, or has an agent in this district.

19.     Personal jurisdiction over each of the Defendants is also proper in New York in that the claims asserted here arise from one or more of the following acts:

    a.   Each of the Defendants, in person or through an agent, transacts business within New York or has consented to supply services in New York; or

    b.   Each of the Defendants, in person or through an agent, has committed a tortious act within New York; or

    c.   Each of the Defendants, in person or through an agent, committed a tortious act outside New York causing injury to persons or property within New York and regularly does or solicits business in New York; or

    d.   Each of the Defendants, in person or through an agent, committed a tortious act outside New York causing injury to persons or property within New York; each expected or should reasonably have expected the act to have consequences in the State of New York; and each derived substantial revenue from interstate or international commerce.

20.     The activities of the Defendants and their co-conspirators were within the flow of, and were intended to, and did, have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

## PARTIES

### Plaintiff

21.     Plaintiff iSpeedbuy is a Maryland LLC with its principal place of business at 14830 Sapling Way Glenelg, MD 21737.  iSpeedbuy transmits content via A2P SMS.  During the relevant time, iSpeedbuy 1) leased one CSC from Neustar; 2) sent its A2P SMS through one or more of the aggregators involved in the conspiracy; 3) transmitted A2P SMS that eventually reached customers of the Carrier Defendants; and 4) received A2P SMS from customers of the Carrier Defendants.  iSpeedbuy has paid CSC lease fees, per-message fees, connectivity fees, and program-review fees during the time period relevant to this Complaint.  iSpeedbuy is subject to content audits and any sanctions associated with content audits.

### Defendants

22.     Defendant Cellco Partnership d/b/a/ Verizon Wireless ("Verizon Wireless") is a Delaware partnership with its principal place of business at 1 Verizon Wireless Way, Basking Ridge, New Jersey 07920.  It is a joint venture of Verizon Communications Inc. (55%), which has its principal place of business at 140 West Street New York, New York, 10007, and Vodafone Group PLC (45%), which has its principal place of business at Newbury, Berkshire RG14 2FN, England.  Verizon Wireless's telecommunications network has the largest number of subscribers in the United States.  At all relevant times, Verizon Wireless customers received and sent A2P SMS.

23.     On or about January 9, 2009, Verizon Wireless acquired Alltel Wireless ("Alltel"), the then fifth largest provider of wireless services in the United States.  At all relevant times until January 9, 2009, Alltel customers received and sent A2P SMS.

24.     Defendant AT&T Mobility LLC ("AT&T") is a Delaware corporation with its principal place of business at 5565 Glenridge Connector, Atlanta, Georgia 30342.  It is the second largest provider of wireless services in the United States.  Until January 2007, AT&T Mobility was known as Cingular Wireless LLC.  At all relevant times, AT&T customers received and sent A2P SMS.

25.     Defendant Sprint Nextel Corporation ("Sprint") is a Kansas corporation with its principal place of business at 650 Sprint Parkway, HL-5A STX, Overland Park, Kansas 66251. It is the third largest provider of wireless services in the United States.  Sprint was formed in August 2005 after the acquisition of Nextel Communications by Sprint Corporation.  At all relevant times, Sprint customers received and sent A2P SMS.

26.     Defendant T-Mobile USA, Inc. ("T-Mobile") is a Delaware corporation with its principal place of business at 12920 SE 38th St., Bellevue, Washington 98006.  It is the fourth largest provider of wireless services in the United States.  At all relevant times, T-Mobile customers received and sent A2P SMS.

27.     Defendant U.S. Cellular Corporation ("U.S. Cellular") is a Delaware corporation with its principal place of business at 8410 W. Bryn Mawr, Chicago, Illinois, 60631.  U.S. Cellular is the sixth largest provider of wireless services in the United States.  At all relevant times, U.S. Cellular customers received and sent A2P SMS.

28.     Defendant CTIA is a trade organization with its principal place of business at 1400 16th St., NW, Suite 600, Washington, D.C. 20036.  The Carrier Defendants have all been members of the CTIA Board of Directors during the entire relevant time period.  At all relevant times, the Carrier Defendants dominated and controlled the CTIA's activities through its Board of Directors and through its budget.  At all relevant times, the CTIA acted as the agent of the

Carrier Defendants. At all relevant times, the CTIA through Neustar and the Intercarrier Messaging Guidelines controlled the use of CSCs at the direction of the Carrier Defendants.

29.    Defendant Ericsson Inc. ("Ericsson") is a Delaware corporation with its principal place of business at 6300 Legacy Drive, Plano, Texas, 75024. Ericsson is a CSC connection aggregator, a company that at all relevant times has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

30.    Defendant MBlox, Incorporated ("MBlox") is a Delaware corporation with its principal place of business at 430 N. Mary Avenue, Suite 100, Sunnyvale, California 94085. MBlox is a computer software company and a CSC connection aggregator, a company that at all relevant times has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

31.    Defendant OpenMarket, Inc. ("OpenMarket") is a Michigan corporation with its principal place of business at 2211 Elliott Ave., Suite 400, Seattle, Washington 98121. OpenMarket is a CSC connection aggregator, a company that at all relevant times has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants. On March 23, 2010, OpenMarket acquired MX Telecom, Inc., a CSC connection aggregator, a company that, at all relevant times until March 23, 2010, had provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

32.    Defendant Sybase, Inc. ("Sybase") is a Delaware corporation with its principal place of business at One Sybase Drive, Dublin, California 94568. Sybase is a large, multi-national computer software company and CSC connection aggregator, a company that at all relevant times has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

8

33.     Defendant Syniverse Technologies, Inc. ("Syniverse") is a Delaware corporation with its principal place of business at 8125 Highwoods Palm Way, Tampa, Florida, 33647. Syniverse is a CSC connection aggregator, a company that at all relevant times has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

34.     Defendant Vibes Media ("Vibes Media") is a Delaware corporation with its principal place of business at 300 W. Adams St., 7th Floor, Chicago, Illinois  60606.  Vibes Media is a CSC connection aggregator, a company that at all relevant times has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

35.     Defendant Soundbite Communications, Inc. ("Soundbite") is a Delaware corporation with its principal place of business at 22 Crosby Dr., Bedford, MA 01730.  On February 27, 2012, Soundbite acquired 2ergo Americas, Inc., a CSC connection aggregator, a company that, at all relevant times until February 27, 2012, had provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

36.     Defendant 3C Interactive, L.L.C. ("3Cinteractive") is a Delaware company with its principal place of business at 750 Park of Commerce Blvd., Suite 400, Boca Raton, FL, 33487.  3C Interactive is a CSC connection aggregator, a company that at all relevant times has provided connection services between CSC Lessees and the networks controlled by the Carrier Defendants.

37.     Ericsson, Mblox, OpenMarket, Sybase, Syniverse, Vibes Media, Soundbite, and 3C Interactive are referred to collectively as the "Aggregator Defendants."

38.     Defendant WMC is a Virginia company with its principal place of business at 601 Pennsylvania Avenue NW, South Building, Washington, D.C. 20004. WMC has been retained by the CTIA and the Carrier Defendants to monitor the content being transmitted from CSCs and to discipline CSC Lessees. At all relevant times, the Carrier Defendants and the CTIA have dominated and controlled WMC's activities.

## CO-CONSPIRATORS

39.     Neustar has conspired with Defendants (i) to require CSC Lessees to acquire CSC leases and (ii) to fix or coordinate prices for CSC leases. Neustar is a Delaware corporation with its principal place of business at 21575 Ridgetop Circle, Sterling, Virginia 20166. Neustar is the "CSC Administrator" and has been since CSCs were created in 2003. Neustar is the exclusive provider of leases for CSCs in the United States. It is the only entity authorized to lease CSCs to CSC Lessees. At all relevant times, the Carrier Defendants and the CTIA have dominated and controlled Neustar's activities with regard to its leasing of CSCs.

40.     Various persons and firms not named in this Complaint have conspired with Defendants (i) to require CSC Lessees to acquire CSC leases, purchase aggregator services, and submit to program review and (ii) to fix or coordinate prices for CSC leases and CSC program review. Various persons and firms not named in this Complaint have conspired with Defendants to engage in a concerted refusal to deal with CSC Lessees using ten-digit telephone numbers. Various persons and firms not named in this Complaint have also aided Defendants in their efforts to conspire to monopolize the A2P SMS transmission market.

## FACTUAL ALLEGATIONS

**A.    The CTIA**

41.     The CTIA, the cellular telecommunications and wireless services trade association, at all relevant times has counted among its members the vast majority of the carriers providing most of the telecommunications services in the United States, including the Carrier Defendants.

42.     Since 2002, the presidents and CEOs of the Carrier Defendants or their predecessors, have continuously sat on the CTIA Board of Directors and served as officers of the CTIA.  The current Chairman Emeritus of the CTIA Board of Directors is the CEO of Sprint, the current Vice Chairman is the President and CEO of U.S. Cellular, and the current Secretary is the President and CEO of Verizon Wireless.  The President and CEO of T-Mobile and the CEO and President of AT&T are also members of the Board.

43.     Eighty to ninety percent of the CTIA's dues revenues have come from the Carrier Defendants.  The Carrier Defendants have also, throughout the relevant time period, contributed the majority of the CTIA's other revenue sources, largely for purposes of research and lobbying.

44.     The Carrier Defendants have dominated and controlled the CTIA through their financial contributions to the organization's budget and through their occupation of at least 50% of the titled officer positions on the CTIA Board of Directors in virtually every year since 2002.

45.     The CTIA and its internal working groups have provided the Defendants with the ability to interact at meetings, conferences and trade shows to address common issues and to carry out a conspiracy such as the one alleged in this Complaint.

**B.    Creation and Enforcement of the CSC System**

46.    In 2003, the CTIA Board of Directors, then largely comprised of the CEOs of the Carrier Defendants and other carriers, agreed to and began setting in motion a concerted approach to A2P SMS.  On March 15, 2003, the CTIA Board voted to create and implement the CSC system.

47.    Having realized that text messages were being used as a way for businesses to communicate with consumers, the Carrier Defendants decided to take advantage of the expansion of text message transmissions.

48.    The Carrier Defendants agreed that they would not honor CSC Lessees' use of ten-digit telephone numbers issued under the North American Numbering Plan ("NANP") and regulated by the Federal Communications Commission ("FCC"), which had most often been used and could continue to be used to transmit text messages.  Instead, CSC Lessees would be forced into a privately-administered system using the new five-digit (later also six-digit) CSCs.

49.    Despite the fact that there was no legal or technological reason ten-digit federally-regulated numbers could not be used by CSC Lessees to reach customers, the members of the CTIA, led by the Carrier Defendants, agreed they would only permit the transmission of A2P SMS through five-digit (and later six-digit) CSCs and would refuse to transmit any A2P SMS through ten-digit numbers, although P2P messages would still be allowed to be transmitted through ten-digit numbers.

50.    The CTIA incorporated these restrictions into its Intercarrier Messaging Guidelines for carriers and providers of wireless content, which the Carrier Defendants agreed to enforce as rules to justify refusals to transmit A2P SMS sent through ten-digit numbers and to require aggregators to block A2P SMS coming from ten-digit numbers.

51.     At all relevant times, each Carrier Defendant refused to deal with any CSC Lessee seeking to use ten-digit codes and required all CSC Lessees to use CSCs leased from Neustar.

52.     Thus, any CSC Lessee seeking to reach the subscribers of any of the Carrier Defendants or any other carrier members of the CTIA (which carriers collectively control almost the entire subscriber base CSC Lessees wish to access) had to use CSCs.

**C.      Requirements For Obtaining and Maintaining a CSC**

53.     The Defendants have collectively imposed on CSC Lessees a number of costly requirements and prerequisites for using CSCs.

**1.      Leasing a CSC**

54.     First, a CSC Lessee must lease a CSC from co-conspirator Neustar.

55.     CSC Lessees must pay Neustar arbitrary lease rates of $500 per month for randomly selected CSCs and $1,000 per month for specific CSCs (CSCs selected by the CSC Lessee), in contrast to the $1 or less per month charged for rental of a ten-digit code.

56.     At present, approximately 4,200 CSCs are being leased from Neustar – 40% of them specific and 60% random.

57.     The rates are the same for every CSC Lessee leasing a CSC from Neustar, regardless of which carriers the CSC Lessee accesses or how the CSC will be used.  The rates cannot be negotiated or changed.  It costs a CSC Lessee $500 or $1,000 per month to reach any of the Carrier Defendants' customers through A2P SMS.  These arbitrary rates have not changed since 2003, and they are not cost-based.

58.     CSCs must be leased in increments of at least three months.  For example, no CSC Lessee can lease a CSC for one month.

59.     CSCs can never be purchased or transferred between CSC Lessees.  They can only be leased from Neustar.

60.     The CSC lease rates Neustar charges CSC Lessees have been set in the CTIA's contract with Neustar.

61.     The Carrier Defendants control the CTIA and its operation of the CSC system and set the rates in the CTIA's contract with Neustar.

62.     The CTIA collects royalty payments from all CSC leases administered by Neustar.

63.     Neustar pays the CTIA several million dollars annually in such royalties.

64.     Neustar has generated approximately $15 million in the last year from the leasing of random CSCs and $20 million from the leasing of specific CSCs, a portion of which profits it has remitted in royalties to the CTIA.

65.     Neustar's revenues from CSCs have increased by millions every year for the last five years as result of increases in the number of registered CSCs.

### 2.     Paying Program Review Fees

66.     Unlike a user of a ten-digit code, a CSC Lessee that has paid for a CSC cannot use that CSC until the CSC Lessee has had its proposed content reviewed and approved by the Carrier Defendants.

67.     This review is accomplished through a program review system established by an agreement among the Carrier Defendants.  The review involves the evaluation of a CSC Lessee's program brief describing the proposed content of the CSC Lessee's text messages.

68.     The CSC Lessee must pay separately for each carrier's review of the CSC Lessee's program brief.

69.     Review of a program brief by the Carrier Defendants usually costs approximately $2,700.

70.     The program review fees are coordinated among the Carrier Defendants, who have all agreed to charge program review fees within a certain range.   The Aggregator Defendants collect the program review fees for the Carrier Defendants.

71.     Even after paying for a review, CSC Lessees are not guaranteed permission to transmit their content.  Any carrier can reject a program brief for any reason based on its subjective evaluation of the proposed content and require the submission of a new program brief with an accompanying payment.  A rejection is not always explained, so that CSC Lessees can continue submitting program briefs indefinitely without being told what is wrong with their proposed content and continue paying the Carrier Defendants' program review fees.

72.     If the relevant carriers approve the content described in a CSC Lessee's program brief, that CSC Lessee has permission to transmit *only that content*.  If a carrier says it has reason to believe based on its sole and unilateral interpretation that a CSC Lessee has transmitted content not described in its program brief, that CSC Lessee's connection will be terminated regardless of whether transmission of that content resulted in any harm.  That CSC Lessee will then have to reapply for permission to transmit its content and submit to a new set of program brief reviews with the attendant additional fees.

73.     The program review system thus gives the Carrier Defendants not only the ability to charge expensive program review fees, but also the power to deter challenges to their monopoly system and to arbitrarily disconnect CSC Lessees.

74.     Content monitoring is not necessary to protect users from spam, because the Telephone Consumer Protection Act, 47 U.S.C. §227, and CAN-SPAM, 15 U.S.C. 7701, *et seq.*,

already prohibit the transmission of spam.  Nor have any governmental bodies delegated industry self-regulation powers to the Defendants requesting them to review and monitor content.

75.     The only reason the program review system exists is to generate exorbitant fees for the Carrier Defendants.

### 3.     Connecting to Aggregators

76.     CSC Lessees who have paid to lease CSCs and had their proposed content approved by the carriers whose customers will be receiving that content still cannot send their text messages directly to customers of carriers as users of ten-digit numbers are allowed to do.

77.     The Carrier Defendants have refused to connect directly with any CSC Lessees except a select few, such as Facebook and Twitter (and several others) who are favored for their brand recognition and their volume.  All CSC Lessees, besides Facebook, Twitter and a few others, must employ a small group of aggregators, which includes the Aggregator Defendants.

78.     At all relevant times, each of the Aggregator Defendants has contracted and conspired with the Carrier Defendants to connect CSC Lessees to the Carrier Defendants.

79.     Pursuant to their agreements with the Carrier Defendants, each of the Aggregator Defendants has charged CSC Lessees unnecessary connectivity fees, as well as exorbitantly high per-message fees and has conducted audits of CSC Lessees' content.

80.     The Aggregator Defendants and the Carrier Defendants split the per-message fees, with the Carrier Defendants receiving the majority of the per-message fees.

81.     Per-message fees are universally imposed on CSC Lessees at rates agreed upon among the Carrier Defendants and the Aggregator Defendants.

82.     These per-message fees are a high multiple of the fees charged for transmitting text messages from ten-digit numbers.  CSC Lessees pay as much as $0.03 per message, whereas users of ten-digit numbers may obtain unlimited messaging for approximately $20 per month.

83.     CSC Lessees are also charged additional fees each time they change aggregators. If a CSC Lessee decides to change aggregators, even though it will continue submitting content to the same carriers, it is obliged to submit a new program review brief and pay the program review fee anew.

84.     In addition to charging CSC Lessees per-message fees and connectivity fees and collecting program review and per-message fees for the Carrier Defendants, the Aggregator Defendants also act as enforcers of the CSC system and Defendants' conspiracy.

85.     Pursuant to their agreements with the Carrier Defendants and the CTIA Intercarrier Messaging Guidelines, the Aggregator Defendants are prohibited from transmitting more than a certain volume of messages (approximately 100 messages) from ten-digit numbers to the Carrier Defendants.  This restriction, the enforcement of which is a condition of the Aggregator Defendants' continued employment by the Carrier Defendants, prevents the Aggregator Defendants from transmitting any high volume of A2P SMS from ten-digit numbers.

86.     The Aggregator Defendants are also required, pursuant to their agreements with the Carrier Defendants and the CTIA Intercarrier Messaging Guidelines, to terminate the connections of any CSC Lessee they catch transmitting A2P SMS from ten-digit numbers.

87.     The Aggregator Defendants not only profit from the conspiracy and aid in its enforcement, they also understand that they play an instrumental role in the illegal conspiracy. Each Aggregator Defendant has known that: (a) each Carrier Defendant has required aggregators to enforce the restrictions against use of ten-digit codes for A2P SMS; (b) each Carrier

Defendant has contracted with the other Aggregator Defendants to require each other Aggregator Defendant to disconnect any CSC Lessee attempting to transmit A2P SMS from ten-digit numbers; and (c) the other Aggregator Defendants have enforced the policy of disconnecting any CSC Lessee attempting to use ten-digit numbers to transmit A2P SMS.

### D.    Abuse of Market Power Through Content Audits

88.    Unlike a user of a ten-digit code, CSC Lessees have faced constant content audits by WMC, the CTIA, the Carrier Defendants and the Aggregator Defendants.

89.    WMC has and continues to perform audits on behalf of the CTIA and the Carrier Defendants. Carrier Defendants, the CTIA and the Aggregator Defendants also perform content audits. The audits ostensibly have been intended to monitor the content being transmitted via A2P SMS, as well as the print and media advertising that references a CSC.

90.    If an audit has resulted in a finding of noncompliance as to the A2P SMS content or advertising, the Carrier Defendants have blocked the CSC that the CSC Lessee has paid for. In other words, the CSC Lessee no longer has been able to send messages to or receive messages from the blocking Carrier Defendants' customers using the blocked CSC. Blocking has often occurred with no warning or opportunity to correct any allegedly noncompliant A2P SMS content or advertising.

91.    This audit process has been and continues to be enforced in an arbitrary and discriminatory fashion. The decisions regarding which CSC Lessees are audited and threatened with blocking are unclear and not explained.

92.    The audit process has given the Carrier Defendants and the CTIA the power to deter challenges to the CSC system and to arbitrarily disconnect CSC Lessees.

93.     As a result of the constant threat of blocking because of the audit process, CSC Lessees have often leased multiple CSCs as standby resources in case a CSC is blocked as a result of an allegedly noncompliant audit.  Also, CSC Lessees using one CSC for multiple customers have been forced to lease extra, stand-by CSCs.  These practices have artificially increased the number of CSCs that must be leased at inflated prices.

## CLASS ACTION ALLEGATIONS

94.     Plaintiff brings this class action lawsuit on behalf of itself and proposed Class members under Federal Rules of Civil Procedure 23(a), (b)(1)(A) and (b)(3).

95.     Plaintiff seeks certification of the following class (the "Class"):

All entities and persons who leased a Common Short Code from Neustar, Inc. at any time from April 5, 2008 to the present (the "Class Period") and have sent or received A2P SMS through one or more aggregators.

The Class excludes government entities and Defendants, as well as Defendants' parents, affiliates, subsidiaries, officers and directors.

96.     The Class comprises thousands of CSC Lessees.  The Class is so numerous that joinder of all members is impracticable.

97.     Common questions of law and fact exist as to Plaintiff and all Class members and predominate over any questions that affect only individual members of the Class.  The common questions of law and fact include, without limitation:

a)      Whether Defendants concertedly denied CSC Lessees the ability to transmit A2P SMS through ten-digit numbers and refused to deal with CSC Lessees seeking to use ten-digit numbers to send A2P SMS;

b)      Whether Defendants engaged in a combination or conspiracy to require CSC Lessees to lease CSCs at agreed-upon supra-competitive prices, to pay

unnecessary connectivity fees and inflated per-message fees and to submit

program review briefs at unnecessary and excessive prices;

c)    Whether Defendants abused their market power by requiring CSC Lessees to

submit to an arbitrary process of auditing content of A2P SMS;

d)    Whether Defendants intentionally conspired to monopolize and exploit the A2P

SMS transmission market;

e)    The duration and extent of Defendants' anti-competitive behavior;

f)    Whether Plaintiff and Class members suffered injury as a result of Defendants'

conduct;

g)    The appropriate measure of compensatory damages for inflated, unnecessary and

fixed fees paid as a result of Defendants' anti-competitive conduct; and

h)    Whether Plaintiff and Class members are entitled to injunctive relief.

98.    Plaintiff's claims for damages and injunctive relief are typical of the claims of

Class members arising out of Defendants' common course of anti-competitive conduct in

violation of the law.

99.    Plaintiff is a fair, adequate, and typical representative of the Class and has no

interests adverse to the interests of absent Class members.  Plaintiff has retained counsel who

have substantial experience and success in the prosecution of complex class actions and antitrust

litigation.

100.    A class action is superior to other available means for the fair and efficient

adjudication of this controversy since individual joinder of all Class members is impracticable.

Class action treatment will permit a large number of similarly situated persons to prosecute their

common claims in a single forum simultaneously, efficiently and without the unnecessary

duplication of effort and expense that numerous actions would engender. If Class members prosecuted separate actions against the Defendants, there would be a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. The expenses and burdens of individual litigants and the lack of knowledge of Class members regarding Defendants' activities make it difficult or impossible for individual Class members to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. The trial and litigation of Plaintiff's and Class members' claims will be manageable.

## TRADE AND COMMERCE

101.   During the relevant time, Defendants and co-conspirator Neustar leased a substantial number of CSCs and sold a substantial amount of aggregation and program review services, and the Carrier Defendants transmitted a substantial number of A2P SMS within the continuous and uninterrupted flow of interstate commerce.

102.   During the Class Period, Plaintiff and Class members directly paid Neustar to lease a CSC in interstate commerce, sent A2P SMS in interstate commerce through one or more aggregators and carriers, paid the Carrier Defendants through aggregators program review and per-message fees in interstate commerce, and directly paid the Aggregator Defendants or their co-conspirators per-message and connectivity fees in interstate commerce.

103.   Defendants' actions were intended to substantially affect interstate commerce and did affect interstate commerce.

21

**FIRST CLAIM**
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**Concerted Refusal to Deal**

104.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 103.

105.    In violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Defendants agreed to and did refuse to deal during the Class Period with any CSC Lessees seeking to transmit A2P SMS through ten-digit numbers.

106.    The Defendants attended CTIA and other meetings, trade shows and conferences and engaged in numerous communications to discuss and effectuate their agreement to refuse to deal with any CSC Lessees seeking to transmit A2P SMS using ten-digit numbers or to allow transmission of A2P SMS sent by any CSC Lessee using ten-digit numbers.

107.    The Defendants have enforced and continue to enforce their combination or conspiracy, among other things, through the audit process conducted by WMC and by blocking CSCs.

108.    Plaintiff and Class members have been injured as a proximate result of the Defendants' combination or conspiracy.

109.    The combination or conspiracy carried out by the Defendants resulted in Plaintiff and Class members having to pay unreasonable, unnecessary and inflated CSC lease fees, per-message fees, program review fees and connectivity fees.

110.    The combination or conspiracy carried out by Defendants also resulted in a number of Class members losing their connections to the Carrier Defendants and the Aggregator Defendants as punishment for their attempted use of the prohibited ten-digit numbers or for having allegedly improper content.

111.    Plaintiff and Class members have been deprived of the benefits of free and open competition.  The Defendants' combination or conspiracy is an unreasonable restraint of competition.

112.    Plaintiff and Class members are entitled to treble damages and injunctive relief to remedy the injuries they have suffered and continue to suffer as a result of the Defendants' violations of Sherman Act § 1.

## SECOND CLAIM
## Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)
## Price-Fixing

113.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 103.

114.    During the Class Period, the Defendants engaged in a contract, combination or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1: (a) to force and did force would-be CSC Lessees to lease CSCs through co-conspirator Neustar at artificially fixed, maintained, inflated or stabilized prices; (b) to force and did force all CSC Lessees to connect to the Carrier Defendants through the Aggregator Defendants and pay unnecessary connectivity fees and inflated per-message fees; and (c) to charge and did charge program review fees to CSC Lessees at unnecessary and inflated prices.

115.    The Defendants attended CTIA and other meetings, trade shows and conferences and engaged in numerous communications to discuss and effectuate their illegal contract, combination or conspiracy: (a) to force all CSC Lessees to lease a CSC at fixed, maintained, inflated or stabilized prices applicable to all CSC Lessees, regardless of the Carrier Defendant to which a CSC Lessee connected through an aggregator; (b) to require all CSC Lessees to connect to the Carrier Defendants through the Aggregator Defendants and to pay unnecessary

23

connectivity fees and inflated per-message fees; and (c) to require the submission of program briefs by all CSC Lessees for unnecessary and inflated fees.

116.    The Defendants have enforced their contract, combination or conspiracy, among other things, through the audit process conducted by WMC and by blocking CSCs.

117.    Plaintiff and Class members have been injured as a proximate result of Defendants' contract, combination or conspiracy.

118.    The contract, combination or conspiracy carried out by the Defendants resulted in payment by Plaintiff and Class members of unnecessary and artificially inflated prices for leasing CSCs, unreasonable and unnecessary program  review and connectivity fees, and inflated per-message fees.

119.    Plaintiff and Class members have been deprived of the benefits of free and open competition.  The contract, combination or conspiracy carried out by the Defendants is an unreasonable restraint of competition.

120.    Plaintiff and Class members are entitled to treble damages and injunctive relief to remedy the injuries they have suffered and continue to suffer as a result of the violations of Sherman Act § 1 carried out by the Defendants.

### THIRD CLAIM
### Conspiracy to Monopolize
### Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)

121.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 103.

122.    The relevant market is the A2P SMS transmission market in the United States.

123.    During the relevant time, the Carrier Defendants collectively have had the majority of wireless subscribers in the United States, have controlled more than 70% of the subscriber base, and have had access to more than 70% of A2P SMS recipients.

124.    During the relevant time, the Carrier Defendants have controlled more than 70% of the United States A2P SMS transmission market.

125.    There are no close substitutes for the transmission of A2P SMS to and from individual subscribers of carriers in the United States, because any entity wishing to send or receive an A2P SMS to or from an individual must obtain A2P SMS transmission by connecting to that individual through the carrier network to which that individual subscribes.

126.    During the Class Period, the Defendants intentionally conspired to monopolize the market for transmission of A2P SMS through the use of exclusionary practices in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

127.    The Defendants have conspired to and did eliminate competition in the A2P SMS transmission market by prohibiting the transmission of A2P SMS from ten-digit numbers and requiring the transmission of A2P SMS through CSCs leased on coordinated terms through a joint selling agent, Neustar, which was granted a monopoly over CSC leases.  By this means, the Defendants and co-conspirator Neustar eliminated the use of the ten-digit number system, in which the Carrier Defendants competed against one another, and replaced it with the CSC system, in which the Carrier Defendants offer their services jointly through the Aggregator Defendants on fixed terms at supra-competitive prices.

128.    The Defendants denied Plaintiff and Class members a low-priced alternative to the CSC system so as to maintain the Defendants' ability to charge unnecessary fees and supra-competitive prices for services related to the use of the CSC system.

129.    The Carrier Defendants and Aggregator Defendants have refused to deal with any CSC Lessees who seek to send their text messages through ten-digit numbers, disconnecting or threatening to disconnect any CSC Lessees or potential CSC Lessees using ten-digit numbers.

130.    During the Class Period, Defendants and co-conspirator Neustar have imposed on CSC Lessees supra-competitive CSC lease fees and per-message fees and unnecessary connectivity and program review fees.

131.    The Defendants have enforced their combination or conspiracy, among other things, through the audit process conducted by WMC and by blocking certain CSCs.

132.    Each of the Defendants has engaged in overt acts in support of the combination or conspiracy to monopolize the A2P SMS transmission market in the United States with the specific intent to monopolize that market.

133.    Defendants' conspiracy to monopolize the A2P SMS transmission market has proximately injured Plaintiff and Class members.

134.    Plaintiff and Class members have been deprived of the benefits of fair and open competition.

135.    Plaintiff and Class members are entitled to treble damages and injunctive relief to remedy the injuries they have suffered and continue to suffer as a result of Defendants' violation of Sherman Act § 2.

## DEMAND FOR JURY TRIAL

136.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

A.   That the Court declare that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiff as the Class representative and appoint Plaintiff's counsel as Class counsel;

B.   That the Court adjudge the conduct described in this Complaint to be an unlawful restraint of trade in violation of Sherman Act § 1 and award Plaintiff and Class members appropriate damages, trebled;

C.   That the Court adjudge the conduct described in this Complaint to be an unlawful restraint of trade in violation of Sherman Act § 2 and award Plaintiff and Class members appropriate damages, trebled;

D.   That the Court permanently enjoin Defendants and any of Defendants' subsidiaries or affiliates from engaging in any of the conduct described herein;

E.   That the Court award Plaintiff and the Class the costs of this suit, including reasonable attorneys' fees; and

F.   That the Court award Plaintiff and the Class such other relief as the Court may deem just and proper.

Dated:  May 10, 2012                    Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

By: _____
Robert N. Kaplan
Richard J. Kilsheimer
Gregory K. Arenson
Elana Katcher
850 Third Avenue
14th Floor
New York, NY 10022
Telephone:  (212) 687-1980
Facsimile: (212) 687-7714
Emails: rkaplan@kaplanfox.com
        garenson@kaplanfox.com
        rkilsheimer@kaplanfox.com
        ekatcher@kaplanfox.com

**KOHN SWIFT & GRAF, P.C.**

Joseph C. Kohn
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Fax: (215) 238-1968
E mail: jkohn@kohnswift.com